Please proceed, counsel. Good morning, Your Honors. I'm Victor Halton, counsel for John Fry. And if, with the Court's permission, I'd like to reserve seven minutes of my time for rebuttal. All right. Watch your clock. Very well. This case involves an unbelievable error that occurred in the Solano County Superior Court during Mr. Fry's third jury trial. The trial court inexplicably excluded evidence that another man had confessed to the double homicide with which Mr. Fry was charged. There were other constitutional errors, but that is the most glaring error in this case. So may I just ask right out, assume, let's assume that I agree that it was constitutional error. My question is, was it harmless error? Right. In light of all the other evidence. Right. Exactly. And that's the core issue before this Court in this case, is one of prejudice. And so because this is a Federal habeas case and we have the overlay of AEDPA to deal with, the question here, the resolution of this prejudice issue, requires this Court to look at the State appellate judiciary's treatment of the prejudice issue. Now, the Attorney General has conceded that the First District Court of Appeal, whose decision we look to here, did not apply the Chapman standard to this constitutional error that occurred. So Mr. Fry never has had the benefit of any Chapman review with respect to this constitutional error. We have cases that address that. Regardless of whether the Chapman standard is applied in the State court, we still determine whether or not there was an unreasonable determination of whether there was prejudice, right? Right. And to me, this is where it gets complicated, because this Court has to say, and the Attorney General cites a pertinent case to the Court in the Attorney General's 28J letter, the — I can't pronounce it exactly, but Ivathong, I think, v. Lamarck case. So this Court asks, was it contrary to U.S. Supreme Court precedent for the First District in its assessment of the constitutional error that occurred in this case? Clearly, it was. I mean, Chapman itself says when you have constitutional error, you have to apply the standard of was that error harmless beyond a reasonable doubt. Now, the California Supreme Court, in its third-party culpability line of cases — and I discussed this in my briefing in a case called People v. Cujo, C-U-D-J-O — says that the California Supreme Court applied Watson rather than Chapman to addressing this type of third-party culpability issue. So the Court in this case, the First District Court of Appeal, did not say what type of prejudice standard it was applying. It just, in a footnote, after sort of cavalierly, in my opinion, treating the exclusion of another man's confession to the homicide as no error, says in a footnote, even if it was error, it was — no possible prejudice could have ensued. So that gets Judge Nelson to your question, where does the prejudice lie in this case? And I've gone through in my briefing, or I've tried to coherently organize the factors concerning prejudice. In that, I think the pronunciation of the case cited by the Attorney General's office, I-N-T-H-A-V-O-N-G, at 420 Fed Third, 1055. In that case, at page 1062, this Court recognized, quote, that confessions have a profound impact on a jury. Here, the source of the evidence of this confession is the person who's the actual killer in this case's cousin, Pamela Maples. And the actual killer is a man named Anthony Hertz. Now, in this case, we have a litany of evidence concerning other people hearing Mr. Hertz, the actual killer, confessing to this Dumbledore homicide. Included amongst those people are estranged girlfriends or lovers of Mr. Hertz, a person who was in jail with Mr. Hertz, somebody who was a friend of Mr. Fries. So as the Attorney General concedes, and as the assigned magistrate judge in this case pointed out at length in his findings and recommendations, although there were, I believe it's a total of seven other specific items of confession or seven other instances of witnesses testifying that Mr. Hertz confessed. I heard Mr. Hertz confessing or making incriminating admissions regarding this confession. All of that other evidence was subject to criticism by the First District Court of Appeal, by the State, as subject to bias, as otherwise not exactly strong evidence, because some of those people were interviewed by police but did not disclose to police what Mr. Hertz, the actual killer, had said to them. They didn't disclose it until trial. And you don't think that Ms. Maples, had she testified, would have been subject to vigorous cross-examination on the basis that she could not tell us the time, place, or date on which Mr. Hertz made this confession? Undoubtedly, Your Honor. She would have been. But that doesn't really mean you can't very well say seven witnesses were cross-examined for impeaching reasons, and an eighth witness would have been cross-examined for impeaching a witness. But that means that it's prejudicial error. It's not harmless error, that eighth witness. What's the difference in the quality of the testimony between those seven and this eighth? The difference in quality is that the jury heard from those other seven. We have never had that. And they didn't believe him. Well, I think some jurors probably did, because we had two prior hung juries and we had the jury, so I don't know. But that's speculation. That is speculation. But the third trial, the third jury heard all seven witnesses finger Hertz. Some of them were impeached for bias, and the jury didn't believe those. You have a witness, Maples, who can't give you time, place, and date, and she could be cross-examined and impeached as to her reliability. Right. And you say that the keeping away from the jury of that one additional and somewhat cumulative witness causes prejudicial error? Absolutely, Your Honor. And the – I mean, this is his cousin, and, yes, as you point out, there are missing Not all cousins like cousins. That's true. That's absolutely true. But shouldn't the jury have then left the opportunity to hear from this woman as Well, if she was the only – if she was the only witness, you'd have a much stronger argument. But as Judge Beall pointed out, she wasn't the only witness to this effect, and so the issue becomes, with that scenario, how can it be prejudicial? But then I direct the court to the Chambers case, Chambers v. Mississippi, where, in that case, the jury was able to hear evidence concerning the third-party culpability in the form of confessions, but then, specifically, the alternative perpetrator or the third-party culpability suspect in Chambers had confessed to the defendant, Mr. Chambers' lawyers, and the defense was able to put that evidence before the jury. However, there were three other confessions to, I think, a reverend and other friends of Gabe MacDonald, the alternate perpetrator in Chambers. And as the U.S. Supreme Court pointed out in that case, you have some confession evidence that went before the jury and some confession evidence that was unconstitutionally excluded. And in assessing prejudice, the Court noted, look, these interlocking confessions, independent of one another, corroborate one another. Ginsburg. But we had seven interlocking already. That's the question. It becomes a, you know, a matter of degree. You know, if you only let in one and there were six others out there, that's one thing. But if you let in seven and there's one out there, that's a whole different perspective in terms of assessing prejudice. Well, I don't know that it's a whole different perspective when, as the magistrate said, the uncontradicted finding is that this was the only unbiased witness on the subject. And as you point out, you know, there's brothers that hate brothers. There's not. Kennedy. Let's go back to the earlier point. Why was the trial court committing constitutional error in using its discretion and finding that there was insufficient foundation to allow the testimony of Maples in? She couldn't recall the time, place or date upon which the statement was made. Isn't that a valid preliminary fact determination by a trial court judge? I agree, Your Honor, that the trial court judge has to, under California law, I think it's Evidence Code section 402, perform that foundational assessment, should this evidence come before the jury. And here you have – I mean, I think the magistrate judge, with sarcasm in his findings and recommendation, I don't want to – I can't quote it exactly, but says, my God, what more do you need? Here, this woman, the cousin, admittedly not hearing all the details, hears a man saying, her own cousin, I reached into the car, shot a woman in her head, took part of her head off, then reached over and shot a man multiple times. That's consistent with the physical evidence in this case. And the – the – Mr. Hertz, the magistrate says, this is something which, of course, Mr. Hertz doesn't do every day without any evidence. Well, he's a – Mr. Hertz is a local drug dealer in Solano County. Ms. Maples testified to that fact when the – Mr. Fry's very able trial counsel asked one of the lead detectives in this case, how many double homicides have we had like this in Solano County? The prosecutor interposed a relevance objection, which the judge sustained. That could have answered some of the foundational questions here, for which Mr. Fry cannot be faulted. But, I mean, the – when you have a man who – seven other people here confessing to this very double homicide committed in what the prosecutor in closing argument said was a unique execution-style homicide, to say that, well, foundationally what Ms. Maples is describing is not sufficiently similar, I think that that just defies common sense. Kagan. Kassel. So, pardon me, let me – it's not so much that the Hertz murder, if it was a murder by Hertz, was so unique, but if Maples can't recall a time, place, and circumstances under which this confession were made, doesn't that suggest that perhaps this confession was suggested to Maples on the eve of trial? I mean, that's – I can't rule that out, Your Honor. I mean, we just don't – But if it is – if that is a rational conclusion upon which the trier of fact on the preliminary issue, which is the trial judge, can conclude, why isn't that sufficient? Well, I don't think a trial judge could conclude that. I mean – and keep it from a jury. I think a trial judge would have to say that's – if, okay, did the defense investigator or defense counsel cook this up and plant the seed in Maples to come forward with this? I think that you have to let that go to the jury. Well, counsel, I had a related question. Did Ms. Maples testify at the first two trials? No, she did not, Your Honor. She was not found until in the – as the evidence phase was going on in the third trial. She was found by the defense investigator. And in the ER, I believe twice, I have reproduced the transcript of the defense investigator's interview of Ms. Maples. And another factor there, it's clear that she becomes emotional when she is – during the transcript of her audio-taped report concerning her overhearing this confession. And she provides detail about the people that are there. Yes, she didn't hear Mr. Hirt say, and I doubt most people when they're confessing to a murder say, on October 26, 1992, at 10 a.m., I killed, you know, Bob and Jim. I thought she couldn't recall the date when she heard the confession. Not the date that the murder occurred, but the date that she heard him confess. She couldn't recall that. No, she could. She said – well, I don't know if she said the specific date, but she said it was in December of 1994 in my sister's apartment in Vallejo. So she was very specific about that, and she was very specific about who was present. She simply said that I walked in, the confession is going on, and I hear these various details being described by Mr. Hirt, and specifically the details concerning reaching in and the – Was there anything in the record as to why she hadn't come forward before? No. No, Your Honor. Are you suggesting that Maple's testimony alone would be sufficient to reverse the conviction? Yes, Your Honor. That's the principal claim here. The – you know, and in addition, we have what the First District Court of Appeal did recognize to be error. They didn't specify whether it was State error or constitutional error, but the exclusion of evidence that Mr. Hirt's partner in crime, Mr. Borelli, was in possession of the murder weapon after the homicide. So, I mean, that just adds to the prejudice in this case. And then as to other factors that clearly militate in favor of a finding of prejudice in this case, this was the – well, first of all, the Supreme Court's decision in Skipper v. South Carolina says that just exactly like this case, where you have multiple witnesses who are biased, testifying to a point, in this case Mr. Hirt's confession, and then you have one unbiased witness, that witness's testimony cannot be deemed cumulative. And that's 476 U.S. at page 8. Then we have – Kennedy. You're mentioning Borelli being in possession of the gun. Yes, sir. Witness Morse was offered to impeach witness Nurendorf's testimony, right? Right. But that was not for the purpose of providing substantive testimony that Borelli was possessing the gun, but simply to impeach Nurendorf. Correct. So there was no evidence that Borelli possessed the gun. That went before the jury. It was kept from the jury. It was kept from the jury, right, because Morse couldn't testify that Borelli had the gun. Morse could only testify that Nurendorf had equivocated or stated two versions, right? Right. And what the – and that's where the First District Court of Appeal found that there was error in not to admit that impeachment evidence, and the content of that impeachment evidence would have contained the fact that Borelli had said he was in possession. But there would have been an instruction given that this evidence is not coming in for the truth of the matter stated, but only to impeach the testimony of Nurendorf. There would have been limited instruction. I don't know. I think under California evidence law, it could have been deemed a prior inconsistent statement, which would have been admitted. It wasn't a prior inconsistent statement by Nurendorf. It was a – oh, I see. Under 1235, it would have come in as substantive evidence of the fact that he knew. I believe that's the way the California law works on the point, Your Honor. Yes. Okay. And then back, Your Honor, to the prejudice. The – this Court's precedent in cases that I've cited in my brief, other circuits' precedent, recognizes that when you have a case that's obviously close, where you've had two prior hung juries, evenly divided, where you have a marathon deliberations, five weeks of deliberations, where the jury declared itself in this third trial deadlocked 7 to 5, those are factors which, despite unanimous case law, militate in favor of a finding of the case was close. And so to treat something as non-prejudicial is close to impossible. Counsel, you've used almost all your time. Do you want to save your remainder for rebuttal? Yes, please, Your Honor. Thank you. Thank you. May it please the Court, Ross Moody, Deputy Attorney General, State of California. I guess I'll just go to the prejudice point. That seems to be what the bench is interested in. I think that in order to assess it, you have to look at what was permitted at trial. This is not a case where a substantial third-party culpability case was – defense was withheld. We had seven witnesses who presented the version that Hertz was the killer, that Borelli was involved. Hertz and Borelli both testified at this trial, and the jury got to see them, have the question put to them, were you involved, did you kill the Bells? And so there's a tremendous amount of defense opportunity to present its case. Was Hertz ever questioned about whether or not he had confessed to his cousin? Was he questioned about that? No. Well, I don't recall that he was asked whether or not he had confessed to his cousin. He was asked whether he had ever admitted to killing the Bells, so he was asked the generic question, and he denied it. I think that it's crucial to actually read the testimony of Maples. Read the 402 hearing. It only takes seven or eight pages of the transcript, and you can see what the problem is. The problem is that she – It is in the record. Where is it in the record? Let me get the psych for you. Okay. I have it in the notes, but let me just get it out of the brief. All right. Okay. And before the transcript 4139, I'm talking about the excerpts of record, because I didn't recall seeing it in the excerpts of record. If something is really important to your case, we – the judges don't get the transcripts unless you designate them in the record. So if there is something that's really important to your case, you should put it in the excerpts of record. That's why I asked you that question. Oh, I appreciate that. That's an oversight on my part, and I apologize to the Court for that. Could you give me the citation anyway? 4137 is where the 402 hearing begins, and 4139 is where the real omissions in what we're looking for occur, where she says she didn't hear the beginning of the conversation, she was in and out of the room, she only heard bits and pieces. And in my opinion, the most important thing she said is she couldn't tell if it was a serious conversation. And doesn't the – doesn't that answer really let the air out of the balloon? You know, you've got seven people who testified in this case that not only that he confessed to a double murder, but that he killed these people, or that he killed two people in a Camaro parked on the side of the road. You know, pretty specific stuff. And the jury heard it all, and they rejected it. Now, what Petitioner is contending here is that if there's one additional witness who couldn't tell you when the conversation started, whether it was serious, she only heard bits and pieces, and she was walking in and out of the room, that this was the crucial evidence that would have overcome. But she did recall that it was in December of 1994 in her sister's apartment in Vallejo. I mean, she – I – yes. I – I have – actually, I had the date as April, but – That's what I thought, April – April, not December. Right. I think she was able to narrow it down to a month and a year, and she was able to tell you who the occupants of the space were. So my – my contention was not so much that she, you know, didn't have enough specificity about the time that she heard these things that she heard, but that what she heard was not enough to say this was a confession by the real killer to this homicide that occurred in Solano County. To go on, she didn't know when it occurred, she didn't know where it occurred, whether it was in California, some other location. When you say it, you mean the murder or her conversation? The – the homicide that was being discussed by – by Mr. Hertz. But she knew the specific facts, and these were unique. And, I mean, she was a reliable witness. And the fact that she only recalled parts of it, but the parts that she did recall were so unique and so similar to the facts of this case, why would it make any difference that she didn't remember every detail? It's not that she didn't remember. It's that she never heard details that were necessary. The fact that she didn't hear – she heard sufficiently – a sufficient amount of facts that were so similar and very unique. It was not just an ordinary shoot-him-up murder. It was the couple and the shooting off the head and the whole business. What does it matter that she didn't remember it all? I think the way that it matters is that you have to link it to the homicide in this case. And if the idea is that this was some kind of a signature crime, people are killing cars all the time. People who are shot with .357s in the head have part of their head come off. In Solano County? That is a very – that is a very important question. Because this – even the state was not mentioned here. She was asked, do you know if this was in California, New York, Arizona? And she said no. And that's in that section of the 402 hearing that I cited to you, to the bench. Did the prosecution object to this testimony coming in? They did object to it. And it was in – it was the prosecutor asking these questions, trying to determine, you know, what do we have here? Do we have an overheard confession? Or do we have something else? A confession – I think that if she is going to say, I wasn't there when it started, I was in and out of the room, and I don't know what was serious, where is the reliability? Usually the prosecution objects to evidence they think is going to hurt them. Well, you know, you can – that's an interesting observation. I think that if you've got seven – if you've got three hung juries, or two hung juries, and a case where almost all the witnesses are methamphetamine users and dealers, yeah, you're going to be in there scrapping for what you can. You're looking for the truth. If you're looking for the truth in the case, wouldn't it be more desirable to have all of the evidence come in and let the jury sort it out if you really are searching for the truth? Well, you know, I appreciate the sentiment, but, you know, do we sit here and say, well, every time the prosecutor makes an objection that – Well, I was a trial judge. So I'm not just talking out of the air. We would have saved a lot of time in this case if the evidence had just come in, and then the jury could have sorted it out. It wasn't irrelevant. It wasn't irrelevant evidence. It was just a matter of – it was a judgment call, you know, for the judge to say whether or not it was sufficiently tied up. But this case would have been simplified tremendously if the court had just let the evidence come in and the jury could have waited like it did the seven others. I certainly agree with that. I still would contend that it does not meet the Brecht test. And on that basis, I'm prepared to submit unless there are further questions. Any questions? Thank you. Just on the Brecht point, this case does raise the question of whether the prejudice issue should be resolved under Brecht since Mr. Frey has never had the benefit of Chapman review. I acknowledge that there is precedent from this Court, and I think there's some mixed signals from this Court's precedent as to whether Brecht or Chapman should apply. And I think that further adding to the confusion is the Supreme Court's decision in Esparza. Could it be that this Court simply just looks to the question of did the California court of appeal apply its prejudice test in an objectively unreasonable manner or a manner contrary to U.S. Supreme Court precedent when it failed to apply Chapman? If so, that's the be-all, end-all of the case. And I think that's the way the Second Circuit has interpreted Esparza. I think recently we've said that Brecht has survived. I think I've read a slip of opinion recently that said that. And I think that's the opinion that the Attorney General cited in the 28-J letter, that unusual name, Inthefong. And so where, and the Court says, well, in Inthefong, we don't think the U.S. Supreme Court would have overturned Brecht in the Esparza case without expressly stating so, even though the Second Circuit concluded that. But even under the Brecht standard here, Mr. Frey has clearly shown prejudice. And the one point that I want to stress in that regard is that the magistrate judge, in his opinion, adopted by the district court, adopted or applied a test under which the burden was on Mr. Frey to show prejudice under Brecht. And this Court in that Inthefong case and other decisions has made it clear, as has the U.S. Supreme Court, that the burden is on the State to rule out prejudice under Brecht. All right. Thank you, counsel. Thank you to both counsel for your argument in this interesting and difficult case. The case just argued is submitted for decision by the Court. The final case on calendar, Martinez v. Alameda, has been submitted on the briefs, and we are in recess for today.
judges: D.W. Nelson, Rawlinson, Bea